Argued May 17, affirmed June 28, rehearing denied September 20, 1921.

# STATE *v.* RATHIE ET AL.

### (199 Pac. 169.)

**Criminal Law—Court's Discretion in Refusing Change of Venue not to be Disturbed Save for Abuse.**

1. Where both sides of the question of change of venue for local prejudice were supported by reputable witnesses, the refusal was within the discretion of the court, and, unless abused, ruling would not be disturbed.

**Jury—Overruling Challenge is Waived if Juror is Accepted.**

2. Error in refusing to allow a challenge to a juror for cause is waived if the party objecting after exhausting his peremptory challenges accepts without objection other jurors to complete the panel.

**Criminal Law—Grand Jurors may Testify to Admissions by Defendant Before Grand Jury.**

3. Members of the grand jury may testify as to admissions made by defendants while witnesses before that body.

**Criminal Law—Court's Finding on Preliminary Question of Voluntary Character of Admissions is not Binding on Jury.**

4. Where the preliminary evidence as to the voluntary character of admissions by defendants was conflicting, court's ruling finding it voluntary in character was not absolutely binding on the jury, but the ultimate decision was for the jury.

**Criminal Law—Appellate Court Will not Review Conflicting Evidence on Preliminary Question of Fact.**

5. The Supreme Court will not review conflicting evidence on the preliminary question as to the voluntary character of admissions by the defendant.

**Criminal Law—Admissions by Defendants Before Grand Jury Held Voluntary and Admissible.**

6. Evidence *held* to show that admissions by defendants as witnesses before the grand jury were of a voluntary character and admissible in evidence against them.

**Criminal Law—An Admission may Sufficiently Corroborate Accomplice Testimony.**

7. An admission of a defendant may be sufficient corroboration of the testimony of an accomplice.

**Criminal Law—Evidence of Assaults Held Admissible as Part of the Res Gestae.**

8. In a prosecution of defendants for killing the sheriff while escaping from jail, evidence that they first assaulted and bound one

---

7. Confession of defendant, as sufficient corroboration of accomplice, see note in Ann. Cas. 1916C, 570.

of his deputies and later assaulted the sheriff and another deputy, during which latter struggle the sheriff was shot, was part of the *res gestae*, though the assaults were distinct offenses.

### Criminal Law—Extent of "Corroboration" of Accomplice Testimony Required, Stated.

9. "Corroboration" of accomplice testimony does not mean separate and complete proof of a crime, but only that there should be some evidence of material facts outside the testimony of the accomplice tending to connect defendant with commission of offense.

### Criminal Law—Accomplice Testimony Held Sufficiently Corroborated by Circumstances Aside from Admissions.

10. In prosecution of defendants for the killing of a sheriff in escaping from jail, evidence of circumstances *held* to sufficiently corroborate the testimony of an accomplice aside from admissions of defendants before the grand jury.

### Criminal Law—Accomplice Testimony may be Sufficiently Corroborated by Circumstantial Evidence.

11. Accomplice testimony may be sufficiently corroborated by circumstantial evidence.

### Criminal Law—Motion for Nonsuit is not a Known Method of Questioning Submission of Evidence to Jury.

12. A motion for nonsuit is not a recognized method in criminal cases of questioning the sufficiency of the evidence for submission to the jury, but the court may in its discretion treat such a motion as a motion for a directed verdict.

### Criminal Law—Rule Stated as to When Verdict will be Directed.

13. A motion directing a verdict in a criminal case may be sustained only when it is a total failure of proof or when the evidence is so weak that a verdict based upon it will be manifestly the result of passion, prejudice or partiality.

### Witnesses—Defendant Testifying in Denial of Statements Made by Him may be Cross-questioned as to What Statements He Did Make.

14. Where, in a prosecution for killing a sheriff in escaping from jail, defendant took the stand in his own behalf and testified in denial of alleged statements made by him before the grand jury to the effect that he had agreed with others that if necessary they would "shoot their way out," the court properly permitted the state to cross-examine him at length as to what he actually did say before the grand jury, both with a view to testing his memory and veracity and to bring out the whole of the conversation or transaction.

---

9. For authorities passing on the question of corroborating accomplices in trials for crime, see notes in 71 Am. Dec. 671; 34 Am. Rep. 408; 98 Am. St. Rep. 158; 41 L. R. A. (N. S.) 954.

13. Right of court to direct verdict of guilty where plea of "not guilty" has been interposed, see notes in 8 Ann. Cas. 808; Ann. Cas. 1916A, 1241.

Witnesses — Defendants Testifying may be Cross-examined as to Former Conviction.

15. Defendants testifying in their own behalf might be cross-examined by the state as to whether or not they had ever been convicted of crime.

Criminal Law—Witnesses—Cross-examination of Accomplice as to Other Offense Held Permissible to Show Motive.

16. In prosecution of defendants for killing a sheriff in escaping from jail, an accomplice, testifying, might be cross-examined as to the offense for which he and one of the defendants had been arrested, not as impeachment of the accomplice, but to show a motive for the killing.

Criminal Law—Instruction as to Defendants Aiding in a Homicide Held not to Invade the Province of the Jury.

17. In a prosecution for killing a sheriff in escaping from jail, a requested instruction, that if the jury had a reasonable doubt as to whether an accomplice killed deceased because of personal grudge or enmity, or whether he killed him pursuant to conspiracy to kill to break jail, provided they also find that there was such a conspiracy, they must resolve such reasonable doubt in favor of the defendant, was properly modified by adding, "unless you further find from the evidence beyond a reasonable doubt that the defendants were then aiding, abetting or encouraging said accomplice in the killing of deceased"; modification not invading province of the jury.

Constitutional Law—Special Election for Submission of Amendment may be Called on the Same Day as the General Primary Election.

18. Under Constitution, Article XVII, authorizing the legislature to submit the constitutional amendment to vote, *held*, that the special election might be called on the same day as the general primary election.

Statutes—Enactment may be Made to Take Effect on Contingency of Adoption of Constitutional Amendment Authorizing It.

19. Laws of 1920, page 46, providing for the execution of the penalty for murder in the first degree, was not invalid because its taking effect was made dependent on the adoption by the people of the constitutional amendment authorizing such penalty.

Criminal Law—Affidavit for New Trial for Newly Discovered Evidence Held Insufficient.

20. In a prosecution of defendants for killing a sheriff in escaping from jail, an affidavit for new trial for newly discovered evidence, stating that witness would testify he was in jail with defendants and that there was no agreement to shoot any person, not stating the source of affiant's information nor the whereabouts of the witness or whether his attendance could probably be secured, was insufficient.

From Umatilla: GILBERT W. PHELPS, Judge.

In Banc.

The defendants were jointly indicted with Neil Hart, Irvin Stoop and Floyd Henderson, for the

crime of murder in the first degree. The indictment charged that:

"The said Neil Hart, John L. Rathie, James Owens, Irvin LeRoy Stoop and Floyd L. Henderson, on the twenty-fifth day of July, A. D. 1920, in the county of Umatilla and State of Oregon, then and there being, did then and there while acting together, unlawfully, feloniously, purposely and of deliberate and premeditated malice, kill one Tillman D. Taylor by shooting him, the said Tillman D. Taylor with a pistol."

The true name of James Owens is Elvie D. Kirby, and he was prosecuted under that name. Hart entered a plea of guilty and was sentenced to death and thereafter executed. Henderson and Stoop were tried before a jury and convicted of murder in the first degree, with a recommendation for life sentence, and were accordingly sentenced to life imprisonment. The remaining defendants were tried together, were convicted of murder in the first degree without recommendation, and were thereafter sentenced to death, from which judgment they bring this appeal, assigning error as follows:

"1. The court erred, over defendants' exception, in refusing to grant a change of venue after demand had been made therefor.

"2. The court erred, over defendants' exception, in not sustaining defendants' challenges for cause to certain jurors, and allowing them to sit to try said cause after the defendants had shown that said jurors had an opinion as to the guilt or innocence of the defendants, and that it would take facts to remove such opinion.

"3. The court erred, over defendants' exception, in allowing the jurors who had been challenged for cause to sit after the defendants exercised all their peremptory challenges.

"4. The court erred, over defendants' exception, in permitting members of the grand jury to testify as to statements made by the defendants before the grand jury, while the said grand jury was in session and considering the case of the defendants.

"5. The court erred, over defendants' exception, in permitting the grand jury to testify in the presence of the jury as to statements made by codefendants and not on trial, which statements were made before the grand jury.

"6. The court erred, over defendants' exception, in refusing to sustain the defendants' motion, allowing any testimony regarding statements made by the defendants, as the same were involuntary and made under duress, and in violation of the defendants' constitutional rights.

"7. The court erred, over defendants' exception, in allowing the testimony of grand jurors to be introduced tending to corroborate the testimony of an accomplice.

"8. The court erred, over defendants' exception, in allowing the testimony to be introduced before the jury regarding commission of crimes being committed in commission of the crime charged.

"9. The court erred, over defendants' exception, in not withdrawing from the jury's consideration the testimony of Neil Hart, he being an accomplice and his testimony uncorroborated.

"10. The court erred, over defendants' exception, in failing to withdraw the case from the jury's consideration and dismiss the indictment at the close of the state's case.

"11. The court erred, over defendants' exception, in permitting the attorney general to cross-examine defendant John L. Rathie on matters and things not gone into on the direct examination.

"12. The court erred, over defendants' exception, in permitting the district attorney and attorney general, in the presence of the jury, to interrogate defendants Owens [Kirby] and Rathie as to the com-

mission of other crimes than charged in the indictment.

"13. The court erred, over defendants' exception, in permitting the district attorney and attorney general to interrogate Neil Hart in the presence of the jury as to the commission of crimes, he not being on trial.

"14. The court erred, over defendants' exception, in permitting the district attorney to testify as to what was said and done by the defendants before the grand jury, and as to statements made by the district attorney to the defendants before the grand jury.

"15. The court erred, over defendants' exception, in failing to direct the verdict of 'Not Guilty' at the close of all the testimony.

"16. The court erred, over defendants' exception, in failing to withdraw from the jury the question of first degree murder.

"17. The court erred, over defendants' exception, in failing to sustain defendants' objection to testimony offered at the time of the trial.

"18. The court erred, over defendants' exception, in refusing defendants' request No. 8 (as shown in defendants' bill of exceptions), in modifying the same, and giving the same as modified, as instruction No. 22, J. Tr. 372, for the reason that the same is an invasion of the province of the jury,—assumes disputed facts and instructs upon the weight of the testimony.

"The court erred in refusing defendants' request No. 9 (as shown by defendants' bill of exceptions), for the reason that the same is material and proper and an instruction that the court should have given under the form of an indictment and the facts as adduced at the time of the trial.

"19. The court erred, over defendants' exception, in giving the following instructions: * *

"In giving instruction No. 17, Tr. 366, for the reason that there was no intent proved, nor was there an attempt to prove the same.

"In giving instruction 18, Tr. 366, 367, for the reason that neither of the defendants so charged used a deadly weapon.

"In giving instruction No. 19, Tr. 367, for the reason that the undisputed fact is, that the crime was committed by Neil Hart, he having confessed to the same, and likewise testified that he committed said crime for the reason that he had a personal grudge against the deceased.

"In giving instruction No. 25, Tr. 369, for the reason that the same is misleading, in this, that had the defendants conspired or agreed to break jail, it does not necessarily follow that they, or either of them, deemed or presumed to have consented to, or commanded the taking of the life of Tillman D. Taylor, as was done by Neil Hart.

"In giving instruction No. 26, Tr. 369, for the reason that the same is misleading and advises the jury that if the defendants came together to accomplish a crime or unlawful act or purpose a conspiracy would be proved. * *

"In giving instruction No. 27, for the reason as set forth above.

"In giving instruction No. 29, for the reason that the same is misleading, and is an invasion of the province of the jury and assumes disputed facts.

"In giving instruction No. 25, for the reason that the same is prejudicial to the rights of the defendants, as there is nothing in the record that would call for such an instruction.

"In giving instruction No. 26, for the reason that the same is prejudicial to the rights of the defendants, as the matters and facts set forth in said instruction are not in dispute. The defendants were attempting to escape jail; the indictment charging conspiracy to take life if necessary. That the matters and things covered by said instruction are not in issue and present to the jury facts by the way of inference which are prejudicial to their rights.

"The same applies to instruction No. 27.

"20. The court erred in denying, over defendants'
exception, the motion for an order to set aside the
verdict of the jury and enter a verdict of acquittal.

"21. The court erred, over defendants' exception,
in imposing the death sentence.

"22. The court erred in denying, over the defend-
ants' exception, defendants' motion for a new trial."

AFFIRMED. REHEARING DENIED.

For appellants there was a brief over the names of
*Mr. Charles F. Bolin* and *Mr. Thomas H. Wilson,*
with an oral argument by *Mr. Bolin.*

For respondent there was a brief over the names of
*Mr. I. H. Van Winkle,* Attorney General, *Mr. R. I.
Keator,* District Attorney, and *Mr. C. Z. Randall,*
Deputy District Attorney, with oral arguments by
*Mr. R. I. Keator* and *Mr. Randall.*

McBRIDE, J.—The first assignment of error re-
lates to the refusal of the court to grant a change of
venue. The defendants presented affidavits tending
to show that deceased was a man of exceptionally
high character and well regarded in the community,
with a wide acquaintance, having been sheriff of the
county for many years; that subsequent to the homi-
cide many of the citizens of Pendleton and vicinity
joined in a posse to capture defendants and the other
persons implicated in the homicide; that when
captured and returned to the county jail a large con-
course of people gathered at the jail; that their num-
bers were such as to lead those in charge of the prison-
ers to fear that the latter would be lynched by a mob;
and that two of the defendants, but neither of these,
were threatened, beaten and ill treated by persons
having them in charge, in order to force them to con-

fess to certain particulars concerning the occurrence
and their flight. It also appears from the affidavits
that the affiants had made inquiry in various sections
of the county and that the bitter feeling in Pendleton
was generally reflected in all parts of the county;
that the local newspapers had published articles tend-
ing to inflame public sentiment against the defend-
ants, which articles had been generally circulated and
read throughout the county; and that by reason of all
this the affiants were convinced that a fair and im-
partial jury could not be secured in Umatilla County.
One of the affidavits is subscribed by Hon. Stephen A.
Lowell, an eminent citizen of Umatilla County and a
former circuit judge. The other affidavits are signed
by L. H. Stoop, a nonresident of the county, father of
the defendant Irvin Stoop, by Charles F. Bolin and
Edward J. Clark, nonresidents of the county and at-
torneys for some of the defendants, and by P. M.
Collier, one of the then attorneys for these defend-
ants. With the exception of Judge Lowell and Mr.
Collier, the parties making the affidavits would not
appear to have any great opportunity of ascertaining
the real trend of public sentiment beyond what was
told them by others, and their judgment of the
probable effect of the articles published in the Pendle-
ton newspapers. The showing, however, is a strong
one and if not contradicted would have furnished the
court ample reason to grant the change. The state,
however, introduced ninety-six affidavits from promi-
nent citizens residing in all sections of the county and
from every walk of life, contradicting the conclusions
which were sought to be drawn from the facts stated
in the defendants' showing. The list comprised seven
lawyers, including Honorable James A. Fee, a former

circuit judge and an old resident of the county, and
many other men distinguished for their probity and
standing in the community.   It is fair to assume that
these men, residing as they did in the various districts
of the county, had as good or perhaps a better op-
portunity of knowing the sentiment of the citizens of
their respective localities than these gentlemen who
made the affidavits on behalf of the defendants.

1. A disputed question supported by respectable
testimony on each side was here presented to the cir-
cuit judge, who from his long service on the bench and
his residence in the county was much better qualified
to decide it than a tribunal of which the members are
not intimately acquainted with the community in
which the trial was had.   It was a question peculiarly
addressed to the discretion of the court, and unless
that discretion was abused, we ought not to disturb
the ruling of the Circuit Court: *State* v. *Humphreys,*
43 Or. 44 (70 Pac. 824); *State* v. *Armstrong,* 43 Or.
207 (73 Pac. 1022); *State* v. *Smith,* 47 Or. 485 (83
Pac. 865); *Multnomah County* v. *Willamette Towing
Co.,* 49 Or. 204 (89 Pac. 389).   We cannot say that
the court abused its discretion in the present instance.

2. Assignments 2 and 3 relate to the action of the
court in overruling defendants' challenges for cause,
thereby compelling defendants to exercise peremptory
challenges in respect to such jurors.   An examination
of the record shows that not a single juror challenged
for cause sat upon the jury and that no one sat upon
the jury who was objected to in any way by the de-
fendants.   Objectionable jurors were either excused
for cause or disposed of by peremptory challenges.
After the defendants' peremptory challenges were ex-
hausted four jurors were called and two were chal-

lenged for cause by the defense and excused. The other two were accepted by both sides without objection. It is the rule in this state that error of the court in refusing to allow a challenge to a juror for cause is waived if the party objecting, after exhausting his peremptory challenges, accepts without objection other jurors to complete the panel: *Ford* v. *Umatilla County,* 15 Or. 313 (15 Pac. 33); *State* v. *Megorden,* 49 Or. 259 (88 Pac. 306, 14 Ann. Cas. 130). This matter was thoroughly considered and discussed in the case last mentioned, and further consideration of it is foreclosed by that opinion.

3. Assignment No. 4 relates to the ruling of the court permitting members of the grand jury to testify as to admissions made by defendants while witnesses before that body. This court has repeatedly held that such testimony was admissible: *State* v. *Moran,* 15 Or. 262 (14 Pac. 419); *State* v. *Ayles,* 74 Or. 153 (145 Pac. 19, Ann. Cas. 1916E, 738); *State* v. *O'Donnell,* 77 Or. 116 (149 Pac. 536).

The fifth assignment is predicated upon a ruling of the court permitting the grand jury "to testify in the presence of the jury as to statements made by codefendants not on trial, which statements were made before the grand jury." Counsel for defendants are evidently laboring under a misapprehension, as a careful examination of the transcript discloses that no such evidence was given in the presence of the jury. There was a preliminary examination of witnesses before the court without the presence of the jury, to determine the competency of certain admissions alleged to have been made by the defendants, and in this preliminary examination reference was made to declarations made before the grand jury.

This evidence was admitted without objection or exception. The court held in substance that the evidence as to the alleged admissions of these defendants was competent and that it was *prima facie* voluntary. The jury was then recalled and the trial proceeded without reference to the preliminary examination made by the court. On the hearing before the jury no evidence was offered or received of the admissions of any of the defendants except Kirby and Rathie. This objection must be held invalid.

4–6. Assignment No. 6 brings up the question as to whether the alleged admissions made by the defendants before the grand jury were in fact voluntary, or whether they were the result of force, threats, fear, or of promises held out to the defendants. If the admissions appear to have been produced by any of these elements, they must be rejected. Primarily, this question is for the court to decide in the first instance; indeed, some authorities go so far as to hold that it is a question exclusively for the court, but in this state it is held that in cases where the preliminary evidence is conflicting, the ruling of the judge in favor of its voluntary character is not absolutely binding upon the jury, but the ultimate decision of that fact should be left to the jury: *State* v. *Morris,* 83 Or. 429, 450 (163 Pac. 567). The finding of the court upon the preliminary investigation will not be disturbed, unless there is clear and manifest error. And we take it that the finding of the jury will not be disturbed unless there is no evidence to indicate that the confession was voluntary. This court will not weigh conflicting evidence on that subject, any more than it would weigh conflicting evidence in regard to any

other fact submitted to a jury.  The evidence for the state on this subject tended to show that the defendants were notified that if they desired to make a statement on their own behalf before the grand jury, they would be permitted to do so; and that prior to going before the jury, the district attorney stated to each of them that he need not appear unless he desired to do so, and that if he did so appear, any statement he might make might be used against him on the trial.  The testimony of Mr. Keator, the district attorney, upon that subject, speaking of Rathie, is as follows:

"I warned him in the presence of Mr. Hutchinson here and I had requested Mr. Hutchinson prior to that time to be present when these people came up for fear they might try to take some advantage of me, and asked him to be very careful as to what was said and I warned him at that time several times over that he did not have to go before that grand jury unless he wanted to and if he did go before the grand jury and make any statements they could be used against him in the trial of this case, and if he did go before the grand jury he had to make a voluntary statement.

"Q. Did you ever tell him at any time that it would be better for him to go before the grand jury?

"A. I never did."

Mr. Keator further testified:

"I told Owens [Kirby] the same as I told Rathie, I warned them time and time again in the presence of Mr. Hutchinson that I was investigating the charge of killing Til Taylor before that grand jury and that they didn't have to go before that grand jury unless they wanted to, but if they wanted to go before that grand jury they could do so, and that if they did go before the grand jury any statement which they made there must be a voluntary statement; and asked them

under the circumstances if they wanted to make a statement and they said they did.

"Q. State whether or not, then, after being so advised, each of the defendants expressed a willingness to go before the grand jury and did go before the grand jury.

"A. They expressed themselves to the effect they were not connected with the murder of Til Taylor and wanted to go before the grand jury.

"Q. After they had entered the grand jury room and before entering upon the testimony in the presence of the grand jury, state whether or not you further advised them regarding their rights.

"A. I cautioned them three or four times there in the grand jury room before I would allow them to make a statement and told them, each one individually as they came in, that they didn't have to make a statement before that grand jury, but if they did it could be used against them in the trial of this case in this court and if they made a statement it had to be a voluntary statement, and I also cautioned them that they did not have to answer any questions propounded by the grand jurors unless they wanted to and they all said they understood their rights and they wanted to make a statement and they did make a statement and they were allowed to answer questions propounded by any member of the grand jury."

That these statements were made to defendants is abundantly corroborated by the two other witnesses who heard the district attorney make them to defendants outside of the grand jury room, and by several of the grand jurors who heard them repeated after the defendants entered the grand jury room. Indeed, the defendants do not rely seriously upon any influence used to direct their will in going before the grand jury, but principally rely upon the fact that ten days prior to the hearing before the grand jury and on the evening that they were brought back to

jail on being recaptured, a large crowd, called by counsel for the defense, "a howling mob," had collected about the jail and threatened to lynch or otherwise mistreat the defendants, and that certain citizens of the town and a detective from Portland had demanded of them an account of their flight and who assisted them therein, had threatened to hang them, and had held a bottle of ammonia to the noses of Hart and Kirby to compel those defendants to disclose these and other particulars. Much of this is true, and concerning the mistreatment of the defendants, while probably exaggerated in many particulars and shown to be absolutely false in some respects by the testimony of responsible citizens, there yet remains enough that is absolutely established to indicate that the defendants on that occasion were disgracefully handled, in a manner that calls for the severest censure and for legal punishment of the perpetrators. That any considerable number of the citizens of Pendleton or of the county countenanced or approved these acts is not shown. Neither does it appear that by reason of these assaults the defendants were induced to make any statements incriminating themselves in any way. Both of these defendants were on the stand and testified that they told the truth before the grand jury, and while they contradicted some of the statements made by the grand jurors who testified, they never claimed that by reason of any pressure brought to bear upon them either at the time the assaults were made or afterwards, or by reason of any hope held out to them, they were induced falsely to make the damaging admissions which members of the grand jury testified were made when the defendants were before that body. In short,

they do not seriously claim that they made these admissions because of threats or promises made by anyone, but deny that they made them at all. We are of the opinion that the preponderance of the evidence indicates that the testimony of the defendants before the grand jury was voluntarily given and that the court in admitting it committed no error.

7. The next assignment is evidently predicated upon the ruling of the court allowing the grand jurors to testify concerning admissions made by Rathie to the effect that when the plot to break jail was being discussed someone suggested that if necessary they would "shoot their way out," and that it suited him, Rathie. This admission, if made, tended to corroborate Hart's testimony that such was the agreement between the defendants. As we have already held that the testimony of a grand juror is admissible generally when required in the interest of justice, it naturally follows that it was admissible in this instance for the purpose for which it was offered. That an admission of a defendant may be sufficient corroboration of the testimony of an accomplice is settled in this state by *State* v. *Meister,* 60 Or. 469 (120 Pac. 406), and *State* v. *Russell,* 64 Or. 247 (129 Pac. 1051).

8. The eighth assignment is predicated upon the admission by the court of the particulars of the jail break generally. The state introduced evidence tending to show among other things that in its execution and before deceased entered the room the defendants had assaulted Marin, the deputy sheriff, thrown him down and taken his pistol away from him, and threatening him with that loaded pistol had forced him into the cell and locked him up. Rathie and Kirby then entered the sheriff's office to search for arms and

ammunition. While they were so engaged, deceased and his deputy Wyrick entered and tried to put them back in jail. Kirby grappled with deceased and Rathie with Wyrick. During the struggle Kirby called for help and Hart came to his assistance. He picked up a gun from the floor and in response to instruction by Kirby to "shoot the son-of-a-bitch," he fired two shots, missing deceased the first time and with the second shot inflicting a wound from which deceased died a few hours later. When deceased was hit, Kirby let go of him, and Wyrick at Hart's command held up his hands. Then Kirby loaded the guns, compelling deceased under threat of death to point out the ammunition. Rathie took another gun off of the person of deceased while he was lying wounded on the bed. Kirby called Stoop and Henderson, and the whole party, thus completely armed, fled to the mountains together. These assaults, and the seizure of arms and ammunition, while each a distinct offense against the law, were so clearly a part of the *res gestae* of the conspiracy of which the shooting was one of the incidents, that it requires no citation of authorities to show that the testimony in regard to them was admissible. Indeed, no objection was made to it at the trial.

9. Assignment No. 9 relates to admission of evidence concerning statements made by defendants before the grand jury to corroborate the testimony of Hart as to the fact that there was an agreement between the defendants to "shoot themselves out," if necessary in making their escape. This has already been discussed in our remarks concerning assignment No. 7, but an indication of the extent of corroboration required may well be inserted here. It may be

promised that corroboration does not mean separate
and complete proof of a crime, because if such proof
were required the testimony of an accomplice would
not be essential. It is only required that there should
be *some* evidence of material facts outside of the
testimony of the accomplice tending to connect the de-
fendant with the commission of the offense: 16 C. J.,
§§ 1438, 1439 and 1440, and cases there cited. In the
judgment of the writer, the circumstances themselves
are corroborative of the crime in the instant case. In
the first place, there was present a motive. The de-
fendants were confined in jail awaiting trial for dif-
ferent felonies serious in their nature and necessarily
involving, if the defendants were convicted, long
terms in the penitentiary. An unsuccessful attempt
to break jail would naturally incline the court to be
more severe in its sentence and might be given in evi-
dence against them on the trial. It is not unreason-
able, therefore, to suppose that when they had made
up their minds to assault the jailer and imprison him
in order to escape, these lawless men would not pur-
sue any halfway measures. They were already armed
with one pistol which had been smuggled into the jail,
and when they overpowered the jailer they took his
and immediately began searching for other weapons.
If they did not intend to use deadly weapons to effect
their escape and to resist opposition, why was the
small pistol smuggled into jail and in their posses-
sion? Why, when they had disarmed the jailer and
locked him up, was it necessary to retain his weapon
and search for others before making their escape?
What, indeed, but better to prepare themselves to re-
sist by force and even unto death any attempt to re-
capture them? Taylor was shot with the very pistol

that the conspirators had taken from the jailer. The five defendants plotted together, made the first attack together, armed themselves together and fled from the jail together. When Taylor and his deputy appeared on the scene after the jailer had been locked up, the defendants did not run away but continued together forcibly resisting their lawful authority until Hart, at the command of Kirby to ''shoot the son-of-a-bitch'' shot Taylor down. And even as he lay wounded and dying, Rathie took from his person a pistol, the fruit of the murder which Hart had been the active agent in committing. Not until they were all completely armed did they leave the scene of the crime, going together. The writer pauses here to say that the one redeeming feature of this tragedy is the act of Rathie in delaying his hurried flight long enough to get a cup of cold water for the dying man. One of the youngest of the band, crime had not yet obliterated every vestige of humanity in him, and on this account it is with regret that we find ourselves compelled by the law and the facts to acquiesce in the decision of the jury which pronounced him guilty of murder in the first degree.

10, 11. Outside of affirmative corroborating evidence by the admission of defendants before the grand jury, the circumstances above detailed furnish sufficient corroboration of the testimony of Hart, and circumstantial evidence may furnish such corroboration: 16 C. J., § 1439.

12, 13. Assignment No. 10 is directed to the refusal of the court to sustain defendants' motion for nonsuit. Although technically speaking no such motion is recognized in a criminal case, yet in fairness we are disposed to treat it as a motion for a directed verdict

and discuss it on that basis. Such a motion will be sustained only "when there is a total failure of proof or when the evidence is so weak that a verdict based upon it would manifestly be the result of passion, prejudice or partiality": *State* v. *Warren,* 41 Or. 348 (69 Pac. 679). As already shown, there was abundant testimony to justify the court in submitting the case to the jury, and the motion was properly overruled.

14. The next assignment predicates error upon the court's ruling permitting the state to cross-examine defendant Rathie as to what he said when a witness before the grand jury. Counsel for defendants put Rathie on the stand and asked him if, when before the grand jury, he had made a statement in substance "that you together with the codefendants had agreed to shoot your way out and that it was agreeable to you"; to which Rathie replied that he had made no such statement. The attorney general then cross-examined at length as to what he actually did say when before the grand jury; to which counsel for defendants excepted. We are of the opinion that the cross-examination was proper, both with a view to testing his memory and his veracity. A witness who is examined as to one part of a conversation or transaction may be required to detail the whole conversation or transaction relating to the same subject. The limit and character of cross-examination are very largely in the discretion of the trial judge and should not be interfered with on appeal, unless that discretion has been abused to the injury of a party. In *Sayres* v. *Allen,* 25 Or. 211 (35 Pac. 254), Mr. Chief Justice LORD, speaking in reference to the limits of cross-examination, said:

"The extent and range of such examination is largely in the discretion of the trial court, and, as a

consequence, its exercise is not subject to appellate review unless a clear case of abuse or manifest injustice is disclosed. The question, then, in the present case is, whether the ruling of the trial court amounted to an abuse of its discretion. It will aid us in the determination of this question to keep in view the object of a cross-examination, and the limit within which the right may be exercised. The object of all cross-examinations is to break the force, or destroy the effect, of the testimony given by the witness on his direct examination, or to lay the foundation for the testimony of other witnesses which shall have that effect. As a means to this end, when a witness has been examined in chief, the adverse party has the right to cross-examine him for the purpose of showing the situation of the witness with respect to the parties and to the subject of the litigation, his interest, his motives, his inclinations and prejudices, his means of obtaining a correct knowledge of the facts to which he has borne testimony, and the manner in which he has used these means, his power of discernment, memory, and description, so that the jury may have the opportunity of observing his demeanor, and of determining the just weight and value of his testimony."

See also *State* v. *McGrath,* 35 Or. 109, 114 (57 Pac. 321).

15. The twelfth assignment of error is predicated upon the ruling of the court permitting the state to ask Kirby and Rathie when they were upon the stand as witnesses on their own behalf, whether or not they had ever been convicted of a crime. The ruling is fully supported by the decisions of this court: *State* v. *Deal,* 52 Or. 568 (98 Pac. 165); *State* v. *Isley,* 62 Or. 241 (124 Pac. 636).

16. Assignment No. 13 is based upon the court's ruling allowing the state to interrogate the witness

Hart as to the offense for which he and Kirby had been arrested. The question was proper, not as an impeachment of Hart, but to show a motive for the killing. It appeared from the answer that they had been arrested by Taylor for "robbery, being armed with guns," and were being held in jail for trial for that offense, the maximum penalty for which is imprisonment for life. The seriousness of the penalty for the crime for which they were awaiting trial, and the fact that deceased had arrested them might well have furnished a motive for taking his life in case he attempted to bar their way to liberty; and for reasons already given the evidence was properly admitted, even though it had a tendency to prove that defendants had committed a crime other than that for which they were being tried: Wharton on Homicide (3 ed.), § 595, p. 915; 21 Cyc. 899; *Miller* v. *State,* 130 Ala. 1 (30 South. 379, 382).

Assignment No. 14 predicates error on the admission of the testimony of the district attorney as to the statements made to and by the defendants in the grand jury room. This has already been considered and is fully answered against the contention of defendants in *State* v. *O'Donnell,* 77 Or. 116 (149 Pac. 536).

The next assignment relates to the court's failure to direct a verdict of not guilty, and has heretofore been discussed.

Assignment No. 16 is based on the failure of the court to withdraw from the jury the question of murder in the first degree. The matter embraced in this assignment has already been passed upon and need not be further considered.

The seventeenth assignment predicates error upon the refusal of the court to give the following instructions:

"The court instructs the jury that all evidence tending to prove or show a conspiracy on the part of the defendants on trial to take life, if any, in making their escape from the jail, is hereby withdrawn from your consideration and you must wholly disregard all evidence of any such conspiracy to kill, if necessary, in the course of a jail break, for the reason that there is not sufficient foundation proved in this case to admit testimony of the acts, declarations, or conduct of any co-conspirator as binding upon the defendants, or either of them, in this case."

As before stated, we are satisfied that there was abundant evidence of a conspiracy on the part of defendants to take life, and the instruction was properly refused.

17. Assignment No. 18 is directed to the court's modification of the following instruction requested by defendants:

"If, after weighing all the testimony in this case, there exists in your minds a reasonable doubt as to whether Emmett Bancroft, *alias* Neil Hart, killed Tillman D. Taylor, if you find he killed him because of a personal grudge, or enmity, or whether he killed him pursuant to a conspiracy to kill, if necessary in order to break jail; provided, you also find that there was such a conspiracy; then, and in such case, you must resolve the reasonable doubt in favor of the defendants and find them not guilty of the crime charged."

The court gave the instruction, but added the following:

"—unless you further find from the evidence beyond a reasonable doubt that the defendants were then and there aiding, abetting or encouraging the said Emmett

Bancroft [Hart] in the killing of the said Tillman D. Taylor, in manner and form as alleged in the indictment.''

We do not believe that this modification in any way invaded the province of the jury. It was proper under the circumstances. If Kirby called upon Hart to shoot, he was certainly aiding and abetting in the homicide. If Rathie held Wyrick, and he admits that he did, and thereby prevented him from assisting Taylor, he was assuredly aiding and abetting in the homicide. The modification was proper.

Assignments 19 and 20 are both predicated upon the assumption hitherto shown to be fallacious, that there had been no previous conspiracy to take life proved by the state's testimony. But, as we have already observed, the testimony of Hart corroborated by the admissions of Rathie and by a multitude of circumstances indicated that a possible or probable taking of human life was within the scope of the plan of escape, should such an act become necessary.

The next assignment challenges the constitutionality of our present statute prescribing the death penalty for murder in the first degree. A history of the enactment of this law, Section 1903, Or. L. (Olson's Compilation), is as follows: Up to December 3, 1914, the laws of this state prescribed the penalty of death for murder in the first degree. At that date, pursuant to a vote of the people by the initiative, the statute prescribing the death penalty was repealed, and it was enacted that the maximum penalty for murder in the first degree should be imprisonment for life. On January 17, 1920, at a special session of the legislative assembly, a joint resolution was

adopted submitting to the people an amendment to the Constitution as follows:

"Section 37. [Article I.] The penalty for murder in the first degree shall be death, except when the trial jury shall in its verdict recommend life imprisonment. * *

"Section 38. All provisions of the laws of Oregon abrogated and repealed as in conflict with Section 36, which section is herein repealed, are hereby revived as of full force and effect from and after the adoption of this constitutional amendment, subject to amendment by the legislative assembly."

On January 20, 1920, Chapter 35 of the General Laws of Oregon for 1920 was enacted with an emergency clause calling a special election to be held May 21, 1920, concurrently with the general primary election, to vote upon certain proposed constitutional amendments and statutes including the amendment above mentioned. The date of the passage of this act is erroneously given in the Session Laws of 1920 as February 20th, but a reference to the original act shows the date to be as before stated. On the same date the act in question was passed. It reads as follows:

"Section 1. Every person convicted of murder in the first degree shall be punished with death, except when the trial jury shall, in its verdict, recommend life imprisonment, in which case the penalty shall be life imprisonment; provided, however, that this act shall take effect as soon as and whenever the constitutional provisions of Section 36 of Article I of the Constitution of the State of Oregon relating to the death penalty, and any amendment or amendments thereto, will permit." Chapter 19, Laws 1920.

18, 19. The power of the legislature to submit the constitutional amendment to a vote at the special

election is clear; Article XVII of our present Constitution expressly so provides. The fact that the special election for this purpose was called on the same day as the general primary election can make no possible difference. That circumstance would have a tendency perhaps to bring out a larger vote and thereby secure a more representative expression of the popular will on the propriety of the measure than otherwise. The contention that the act of February [January] 20, 1920, providing for the execution of the penalty for murder in the first degree, because its taking effect is made dependent upon the adoption by the people of the constitutional amendment, is invalid, is fully answered in the negative and settled in this state by the decision of this court in *Libby* v. *Olcott,* 66 Or. 124 (134 Pac. 13), where a similar contention arose. Mr. Justice BURNETT there summed up the argument by saying:

"All the legislature has done in this connection has been to provide in advance a rule of action to be observed in case certain conditions arise, and it was well within its prerogative when it did so."

See also *State ex rel.* v. *Wilcox,* 45 Mo. 458; *Alcorn* v. *Hamer,* 38 Miss. 652; *Home Ins. Co.* v. *Swigert,* 104 Ill. 653, 655.

20. The last assignment predicates error upon the order of the court overruling defendants' motion for a new trial. The motion is very general in its specifications. It first alleges, "irregularity in the proceedings of the court, jury and adverse party, orders of the court and abuse of discretion whereby the defendants were prevented from having a fair and impartial trial." From the affidavit filed in support of the motion the grievances complained of seem to

be the orders, rulings and acts heretofore discussed and which we have herein sustained. It is set forth in the affidavit that the affiant is informed and believes that the one of the jurors who saf upon the trial was a relative of deceased and therefore disqualified. It does not state the name of the juryman or the source of affiant's information. As all the jurors were residents of Umatilla County, and as deceased was an old resident thereof, it would have been easy for counsel to obtain proof of this relationship, if it actually existed, or to present the affidavit of the person who gave the information. The showing upon this subject is the flimsiest hearsay. The affidavit states that one Robert Jeffery if present would have testified "that he was in jail with defendants and that there was no agreement as to the shooting of any person; that he was aware of the fact that a jail delivery had been planned, but that there was no shooting to take place." The affiant states that he was not advised of what Jeffery would testify to until after the court had proceeded to trial, at which time it was too late to subpoena him, and that he did not know the whereabouts of the witness at the time and was unable to secure him. This affidavit is woefully deficient in that it does not state the source of affiant's information and is pure hearsay. It does not state the whereabouts of the witness, does not show that his attendance could probably be secured at another trial, and does not show that he is or is ever likely to be within the jurisdiction of the court. Not a single ground for the motion is sustained by the record or the affidavit filed in support of it, and it was properly overruled.

We have thus considered every point suggested by appellants' counsel. This consideration, it is need-

less to say, has been given under a sense of the great responsibility devolving upon us in a case where human life may rest upon the result. The defend-- ants, in our judgment, had a fair trial and the record here shows that they were ably and loyally defended by counsel who have contested every phase of the case with skill and energy. That the law and the facts were against them is no fault of counsel, court or jury, but of their own lawless acts. Painful as the duty is, we must acquiesce in the judgment that the law has imposed.

The judgment is affirmed.          AFFIRMED.

Mr. Justice BROWN did not participate in the hearing or consideration of this case, having, as attorney general, conducted the trial in the Circuit Court.

----

Denied September 20, 1921.

ON PETITION FOR REHEARING.

(200 Pac. 790.)

*Mr. Charles F. Bolin* and *Mr. Thomas H. Wilson,* for the petition.

*Mr. I. H. Van Winkle,* Attorney General, *Mr. R. I. Keator,* District Attorney, and *Mr. C. Z. Randall,* Deputy District Attorney, *contra.*

In Banc.

McBRIDE, J.—We have carefully considered the petition of the defendants for a rehearing and are unable to find therefrom any substantial reason for deviating from the views expressed in the original opin-

ion.  It is true that by inadvertence it was stated that
Edward J. Clark, an attorney of Pendleton, was a
nonresident of the county, but in view of what we con-
sider the weight of affidavit testimony introduced on
the motion for a change of venue, we do not look upon
that fact as controlling.  The motion was heard be-
fore a judge who had resided in the county for many
years and who by his long residence and necessary
acquaintance over the county was well qualified to
pass upon the condition of the public mind and to ap-
praise the value of the testimony introduced relating
to this matter.

The other matters urged in the petition for rehear-
ing were carefully considered before the original
opinion was handed down, and, as before remarked,
we see no reason to change our views.  We fully
appreciate the serious consequences of our decision,
but these consequences are such as the defendants
have invoked by their conduct and which we cannot
avert without doing violence to established principles
of the law.  The defendants, in our judgment, had a
fair trial; and anyone who reads the record will see
that they were ably and faithfully defended.  So
viewing the case, we are constrained to deny the peti-
tion for rehearing, and it is so ordered.

REHEARING DENIED.