Argued October 19, affirmed December 18, 1923, rehearing denied January 8, 1924.

## STATE *v.* RUSSELL HECKER.

(221 Pac. 808.)

**Criminal Law—Evidence Held Sufficient to Prove Venue.**

1. In a prosecution for homicide, evidence held to prove venue.

**Criminal Law—Samples of Blood Taken Several Days After Shooting Competent.**

2. The circumstance that samples of blood, taken by witness, were not taken until several days after the shooting, affected the weight but not the competency of the evidence.

Homicide—Testimony as to Blood Spots Held Admissible.

3. Testimony as to blood spots on automobile, highways and bridge was admissible, especially for the purpose of establishing venue.

Criminal Law—Admission of Hat in Evidence Proper.

4. In a prosecution for homicide, where it appeared body was thrown over bridge in a burlap sack, a hat found in the sack with a hole in the front, which could have been made by a bullet, was properly admitted in evidence.

Constitutional Law—Amendment Effective on Date of Proclamation.

5. A constitutional amendment, proposed by legislature, and approved by majority of voters, became effective on the date the Governor issued proclamation declaring the result of the election.

Constitutional Law—Amendment Concerning Capital Punishment not Invalid for Uncertainty.

6. The constitutional amendment of 1920 (Article I, Section 37), reinstating capital punishment, was not invalid for indefiniteness, uncertainty, and repugnance, arising out of the circumstance that the amendment of 1914, abolishing the death penalty, was carried into Or. L., as Article I, Section 37, and the fact that the death penalty amendment of 1920 refers to Article I, Section 36, and the further fact that there were two sections numbered 36 adopted in 1914, one abolishing the death penalty and the other prohibiting the liquor traffic, it appearing that 36 was the number given to the death penalty amendment when submitted in 1914, especially since the constitutional amendment of 1914 was repealed by the amendment of 1920 before Olson's Compilation became effective.

Constitutional Law—Amendment Referring to Wrong Section Number not Invalid.

7. The validity of an amendment of the Constitution would not be affected by the fact that it referred to a prior amendment, which it was repealing, by giving the wrong section number, where the former amendment was set out in full, and only one such section appeared in the Constitution.

Courts—Prior Decisions Disregarded, if Erroneous.

8. If prior decisions are erroneous and wrong, upon principle and authority, the courts should not hesitate to declare the law correctly.

Constitutional Law—Homicide—Statute Providing for Capital Punishment Held Unnecessary.

9. Laws of Special Session of 1920, page 46, Chapter 19, providing that every person convicted of murder in the first degree shall be punished by death, except when jury recommends life imprisonment, is nothing more than a repetition of mandatory language of the constitutional amendment of 1920 (Article I, Section 37), reinstating capital punishment, and was unnecessary because of the irresistible and compelling power of the Constitution.

3. Blood stains as evidence, see note in 15 **Ann. Cas.** 811.

Statutes—Rules Stated as to Time of Taking Effect When Statute
    is Silent in Relation Thereto.

10. Under Constitution, Article IV, Section 28, if legislature is
silent as to when a measure shall take effect, the measure takes
effect 90 days from the end of the session.

Contitutional Law—State Constitution an Instrument of Limitation.

11. The state Constitution is an instrument of limitation and
not an instrument of grant, as is the national Constitution, and
the legislature can enact any legislation not prohibited.

Homicide—Statute Relating to Capital Punishment Held Constitu-
    tional.

12. Laws of Special Session of 1920, page 47, Chapter 20, pro-
viding the method of executing a death sentence was not intended to
become operative before amendment of the Constitution, permitting
capital punishment, and assuming that, under Constitution, Article
IV, Section 28, such enactment became a law 90 days from the
end of the session passing it, or April 17, 1920, on which date the
constitutional amendment of 1914 (Article I, Section 36) abolishing
the death penalty was still in force, such statute was nevertheless
constitutional.

Constitutional Law—Repealed Statute may be Revived.

13. It is competent by a constitutional provision to revive a
repealed statute.

Constitutional Law—Under a Certain Assumption Constitutional
    Amendment of 1920 Restoring the Death Penalty Revived Sec-
    tions 1598–1600, L. O. L.

14. Assuming that Laws of Special Session of 1920, page 47,
Chapter 20, prescribing the mode of executing the death sentence,
is unconstitutional, on the theory that on April 17, 1920, when it
became a law, it was in conflict with the constitutional amendment of
1914 (Article I, Section 36), abolishing the death penalty. Then a
contention that such amendment which repealed all laws in conflict
with it merely suspended and did not repeal Sections 1598–1600,
L. O. L., containing provisions identical with those of Laws of
Special Session of 1920, page 47, Chapter 20, is untenable; it
further resulting from such assumption that since the constitutional
amendment of 1920 (Article I, Section 37), restoring the death penalty,
revives all laws repealed by the amendment of 1914, such sections
of Lord's Oregon Laws are now the law.

Constitutional Law—Constitutional Amendment Reviving Statutes
    Predominates Over New Statutes.

15. If Laws of Special Session of 1920, page 47, Chapter 20,
providing method of executing death sentence, was constitutional on
April 17, 1920, and the constitutional amendment of 1920 (Article
I, Sections 37, 38) thereafter going into effect, revived Sections 1598–
1600, L. O. L., and it is assumed that, because of the proviso in the
last-mentioned sections, these three sections and Laws of Special
Session of 1920, page 47, Chapter 20, cannot stand together at the
same time, then, because a Constitution dominates a statute, the

constitutional amendment of 1920, which revives statutes repealed by the amendment of 1914, gives superior authority to the three sections of Lord's Oregon Laws.

**Constitutional Law—Constitutional Amendment Abolishing Capital Punishment Repealed Inconsistent Statute.**

16. The constitutional amendment of 1914 (Article I, Section 36), abolishing capital punishment, did not merely suspend Sections 1598–1600, L. O. L., providing for capital punishment and method of carrying death sentence into effect, but repealed them.

**Criminal Law—Motion for New Trial must be Filed in Time Prescribed.**

17. A motion for a new trial is required to be filed within the time prescribed by Section 175, Or. L.

**Criminal Law—Consideration of Counter-affidavit on Motion Equivalent to Granting Permission to File.**

18. The fact that a counter-affidavit filed after time prescribed, was considered on motion for new trial was equivalent to granting permission to file the affidavit.

**Criminal Law—Counter-affidavit on Motion for New Trial May be Considered Though Filed After Time Prescribed—"Shall."**

19. Under Section 175, Or. L., requiring counter-affidavits on motion for new trial to be filed within one day after the filing of the motion no good reason exists to prevent the court from considering counter-affidavits filed after the day prescribed, notwithstanding the use of the word "shall" in the statute.

**Criminal Law—Separation of Jurors Held not Illegal.**

20. Where jury was composed of seven men and five women, and single toilet in jury-room was "in such position that it cannot be used by a mixed jury, when both men and women are in the jury-room," there was no illegal separation of the jury, when the bailiff, at the request of the women, took them to a toilet for women about 20 feet distant from the door of the jury-room, after having locked the men in the room, no person speaking to any of the women or entering into any discussion in their presence, under Section 141, Or. L.

**Criminal Law—Instructions to be Taken as Whole.**

21. Instructions must be taken as a whole, and defendant cannot complain of omission of reference to element of deliberation in one instruction, where the court gave elaborate instructions upon the element of deliberation, and the jury could not have been misled.

**Criminal Law—Instruction Held not Inflammatory or Prejudicial.**

22. Objection that an instruction was inflammatory, revolting and gruesome, and especially prejudicial, because some of the members of the jury were women, was without merit, as applied to an instruction, "To illustrate: If an entire stranger, being sane and in possession of his faculties, should walk without provocation out of the audience here, and take an ax, and unlawfully and pur-

posely strike one of you jurymen down dead, the law would con-
clusively presume malice from that act, although there might not be
any proof that he had any quarrel with the person so assaulted."

**Criminal Law—Instruction upon Reasonable Doubt not Erroneous.**

23.   It was not error to instruct, "You should give the defendant
the benefit of all reasonable doubts, and there is no technical way
of judging it other than using your ordinary, plain, common sense
in judging."

**Criminal Law—Requested Instruction on Recommendation of Punish-
ment for Life Sufficiently Covered by Given Instructions.**

24.   In a homicide case, court *held* not to have erred in refusing
to give requested instruction regarding the right of the jury to
recommend, as punishment for first degree murder, life imprisonment,
in view of given instructions covering the matter.

**Criminal Law—Instruction on Self-defense Properly Refused in
View of Other Instructions.**

25.   Where the court instructed the jury fully and clearly upon
subject of self-defense, it did not err in refusing a further instruc-
tion thereon.

**Criminal Law—Instruction on Self-defense Held not Erroneously
Refused.**

26.   Where complete and accurate instructions were given upon
the subject of self-defense, and ample cautionary instructions were
given, court did not err in refusing to give an instruction to the
effect that the fact defendant was armed did not take away or
lessen his right of self-defense.

**Criminal Law—Allowance of an Exception Unnecessary.**

27.   If the court rules upon an objection, and the party advises
the court, he does not acquiesce in such ruling then the record is
complete and nothing more is necessary and the record need not
show that the court allowed the exception.

From Clackamas: J. U. CAMPBELL, Judge.

In Banc.

Russell Hecker was convicted of the crime of
murder in the first degree upon an indictment which
alleged that the defendant on April 16, 1922, in Clack-
amas County, killed Frank Bowker by shooting him
with a gun or pistol. The verdict returned by the
jury found the defendant guilty of murder in the first
degree. The verdict did not recommend life impris-
onment. The judgment of death was pronounced by
the trial court. The defendant appealed.

The defendant attacks the judgment claiming: (1) That the motion, made upon the close of the state's case, to strike out the testimony of Mrs. Lawrence Millner, L. B. Johnston, Gus Schram and George Hudson with reference to seeing stains of blood on the road, should have been allowed; (2) that the admission of samples of stains taken from the pavement was error; (3) that the admission of a hat found with the body of the decedent was error; (4) that there is no law in force prescribing the mode of executing the judgment of death; (5) that the jurors were permitted unlawfully to separate after the cause had been submitted to them; (6) that the court erred in explaining an instruction by supposing the use of an ax by a stranger; (7) that the court erred in one of the instructions on reasonable doubt; (8) that error was committed in the refusal to give a requested instruction as to the penalties for murder in the first degree; (9) that a requested instruction relating to self-defense should have been given; and (10) that the court ought to have given a requested instruction to the effect that the defendant was not to be prejudiced by the fact that he was armed.

AFFIRMED.   REHEARING DENIED.

For appellant there was a brief over the names of *Mr. Gale S. Hill, Mr. Gilbert L. Hedges* and *Mr. Thos. G. Ryan,* with oral arguments by *Mr. Hill* and *Mr. Ryan.*

For respondent there was a brief over the names of *Mr. Livy Stipp,* District Attorney, *Mr. George Mowry,* Deputy District Attorney for Multnomah County, and *Mr. Frank J. Lonergan,* with oral arguments by *Mr. Stipp* and *Mr. Mowry.*

HARRIS, J.—A recital of some of the facts is necessary for a clear understanding of the points presented for decision. For several days prior to Sunday, April 16, 1922, the defendant had been negotiating with Frank Bowker for the illicit sale of whisky which the defendant said a friend of his owned and wished to sell. The price was $80 per case; and it was understood that Bowker would take 15 cases. The defendant was living in Portland in an apartment with a young woman to whom he was not married. Frank Bowker also lived in Portland. There is testimony to the effect that the defendant drove in an automobile to Bowker's home Saturday night, April 15th, arriving there after 9 o'clock, for the purpose of going with Bowker to get the whisky but that the trip was not made because it was too late. Albert Bowker, the brother of the decedent, says that Frank asked him to go along but that he refused to go because he had just completed a long trip and was tired. There is also evidence indicating that the parties mentioned the fact that it might be dangerous to make the trip because officers of the law would be looking for cars with whisky at that hour of night. At any rate the trip was not made that night. The defendant bought a burlap sack, referred to by one of the witnesses as a hop sack, in Portland on that day.

The next day, April 16th, the defendant and Frank Bowker arranged by telephone to meet at the Oregon Hotel in Portland and then make the trip. They met pursuant to the arrangement. Albert was with his brother Frank. The defendant refused to permit Albert to accompany them but he did consent that Albert could follow about half an hour afterwards

with the understanding that they meet at 82nd and Division Streets.

The defendant said it would require about thirty minutes to drive from 82nd and Division Streets to the cache where the liquor was and to return to 82nd and Division Streets. Frank Bowker had with him a 38-caliber revolver. The defendant had with him a 45-caliber revolver which he had borrowed that afternoon. Frank Bowker had on his person a draft for $300 and at least $985 in currency and probably more than that amount. The defendant and Frank Bowker left a little after 7 P. M. in an automobile which the defendant had borrowed; the defendant was driving and Bowker was sitting on the front seat at the right side of the defendant. Albert Bowker drove to 82nd and Division Streets in about half an hour after the departure of the defendant and Frank Bowker. Albert did not again see Frank alive. Mrs. Lawrence Millner resided in Clackamas County at a point which is about a quarter of a mile east of Clackamas Station which is at the first turn of the road. She and her husband heard a shot about 7:30 P. M., April 16th, "right down in front of the house." On the following Friday she saw spots on the pavement about halfway between her house and "the next turn on the road," "between my house and the filling station."

L. B. Johnston lived at Gladstone. The Rahn & Herbert greenhouse is between Oregon City and Clackamas Station and is about half a mile from the latter place. On Monday April 17th at 6:30 A. M. while on his way to work at the Rahn & Herbert greenhouse, Johnston saw a spot of blood about six inches in diameter "and a few little drippings around the spot" on the pavement at a point which

is fifty or sixty feet from a rock cut that is a little over a mile from the greenhouse.

Gus Schram lived at Clackamas and worked at the Rahn & Herbert greenhouse. On Monday, April 17th, at about 6:50 A. M. while on his way to the greenhouse Schram saw a pool of blood on the road "just this side of Piper's place."

George Hudson resided at Clackamas Station and worked at the greenhouse. He was with Schram on the morning of April 17th and he saw "a red brownish spot on the pavement and it looked like blood"; and he explained that the Piper house is between Clackamas and the greenhouse.

H. C. O'Neil operated a service station on the Pacific Highway at Horseshoe Park, which is thirty-three miles south of Portland and two miles north of Woodburn. At about 9:30 P. M. on April 16th the defendant stopped at this service station and bought gasoline for the car he was driving. The station was lighted with electric light. O'Neil noticed that the defendant's "hand was all blood * * and on the running board was a puddle of blood." Albany is "about 80 miles" south of Portland. About 2 A. M. on April 17th the defendant got a room with a bath at a hotel in Albany. In about half an hour the defendant came from the room and into the lobby and soon afterwards left. The bed in the room was not used, but the bath and towels were used. "All over on" one towel was a stain that looked like blood. From the hotel the defendant went to the residence of Ira Coleman and after awakening him paid him $65 in satisfaction of a debt, and also handed to Coleman a package containing $634 in currency with the request that Coleman keep it for the defendant.

Between 8 and 8:30 on the morning of April 17th the defendant was in Portland and there bought one front mat, one rear mat and one rear seat cushion for the automobile and put these articles in the car. He parked the automobile on one of the Portland streets and notified the person from whom he had borrowed the car. The automobile had blood on it at different places. About 2 P. M. of that day the defendant was in the custody of the police.

On Tuesday, April 18th, the defendant, his father, and his attorney, the chief of police and other officers drove in an automobile to a bridge that crosses the Calapooia River near Albany. On the bridge were particles of burlap and blood. On the following Thursday or Friday the body of Frank Bowker was found in the water some distance below the bridge in a sack, the open end of which had been tied with a string. An examination of the body disclosed that the decedent had been shot through the head, the point of entrance being in the back of the head to the right of the mid line and the point of exit being in the front of the head to the left of the middle line.

W. A. Barker a policeman saw a spot on the pavement between four and five hundred feet south of Clackamas Station "where the road makes the turn." He scraped off a sample with a knife. He found another stain "halfway between where the road turns, where the turn is, and the filling station"; and for a distance of about two hundred feet there were drippings leading up to this spot. Barker scraped a sample from this spot. Both samples were taken on April 21st, five days after the alleged homicide. A chemical analysis was made by an expert and each

109 Or.—34

sample revealed human blood. The same expert testified that the automobile used by the defendant and the revolver which he had borrowed revealed human blood; and he also testified that he found human blood on a stick taken on April 18th from the bridge off which the body of decedent apparently had been thrown. Grace Herbert testified about leaving Clackamas at 8:17 P. M. April 16th, and while afoot on her way to her home at the greenhouse she passed an automobile which had stopped at the side of the road "just a little south of the Piper house," and this witness gave testimony from which the jury could have inferred that the car was the one used by defendant.

1–4. The route traveled by the defendant took him from Multnomah County, through Clackamas and Marion Counties, and to Linn County, and then back to Multnomah County; and therefore the testimony concerning the stains on the pavement near Clackamas Station was highly important for the purpose of establishing the venue, although it was competent for other purposes; and this testimony, especially when considered in connection with the evidence relating to the firing of the shot, if believed by the jury, proved the venue. The circumstance that the samples taken by Barker were not taken until several days after April 16th affected the weight but not the competency of the evidence. The testimony of the witnesses Millner, Johnston, Schram and Hudson was clearly competent. The samples taken by Barker were likewise competent. The hat was found in the sack with the body. There is a hole in the front of the hat which could have been made by a bullet. The admission of the hat was manifestly competent. Error was not committed in receiving testimony of

the four witnesses named, nor in admitting the samples from the pavement, nor in receiving the hat.

All the facts thus far mentioned were established by the state and all the evidence thus far related was introduced by the state as a part of its case in chief and before any evidence was offered in behalf of the defendant. After the state rested, the defendant testified in his own behalf and admitted that he shot Bowker while in the car on the road, claiming, however, that he killed Bowker in self-defense; and he related in detail the story of his trip to Albany and to the bridge where he threw the body in the Calapooia River, and he told about his return to Portland including the purchase of the two mats and the rear cushion to take the place of the ones which he had thrown away on account of the blood on them. He also testified that he stopped at a point which he thought was the place referred to by Mrs. Millner as being about halfway between the filling station and her house and there removed the body from the front seat and placed it in the back of the car. The jury were warranted in believing from the testimony of the defendant that he killed Bowker in Clackamas County at a point about where the shot was heard and not a long distance from any one of the stains on the pavement. The theory of the state was that the defendant fabricated the story about a friend with whisky to sell and used the story as a ruse to induce Bowker to accompany him in the car and thus enable him to rob Bowker. The theory of the defendant was that Bowker proposed that he and the defendant "hold up" the friend and take the whisky away from him; that the defendant demurred to his proposal; and that as result of their discussion and of Bowker's display of his gun, it became necessary

for the defendant to shoot Bowker in order to protect himself.

The instant case and the case entitled *State* v. *Evans, ante,* p. 503 (221 Pac. 822), were argued in this court on the same day. In each of the two cases it was earnestly contended that the sentence of death was void, because, it was claimed, there is no valid statute prescribing the mode of executing such sentence. Although our previous rulings are adverse to the conclusion urged by counsel: *State* v. *Rathie,* 101 Or. 339, 362 (199 Pac. 169, 200 Pac. 790); *Ex parte Kirby,* 103 Or. 612 (205 Pac. 279); *State* v. *Brumfield,* 104 Or. 506, 540 (209 Pac. 120); and although those rulings afford ample ground for holding that the death penalty is lawful, we shall, since life is involved, examine the question from every angle, to which our attention has been directed. In the case of *State* v. *Evans,* the defendant urged that the constitutional amendment restoring the death penalty was ineffective because of an error in referring to the wrong section number. We shall, in the discussion of the instant case, examine and pass upon all the points raised in both cases, because by so doing we can avoid a repetition of statement and a duplication of discussion. For the sake of brevity Hecker and Evans will sometimes be designated as the defendants. It is necessary as a preliminary to the discussion to relate the history of certain statutory and constitutional provisions appertaining to the death penalty.

At the general election held on November 3, 1914, the voters adopted a constitutional amendment prohibiting the infliction of the death penalty. Prior to the adoption of this constitutional amendment the Constitution was silent upon the subject of the death

penalty. However, there were statutes fixing death as the penalty for treason (Section 1892, L. O. L.), and for murder in the first degree (Section 1903, L. O. L.); and there were three sections of the Code (Sections 1598, 1599, 1600, L. O. L.) prescribing the mode of executing the death sentence. Until November 3, 1914, Article I of the state Constitution embraced only thirty-five sections which were numbered from 1 to 35, inclusive. At the election held on November 3, 1914, two proposed constitutional amendments were submitted to the voters upon initiative petitions: Laws 1915, p. 12. One of the amendments is in part as follows:

"Article I of the constitution of the state of Oregon shall be and hereby is amended by adding thereto the following section, which shall be designated section 36 of Article I.

"Section 36. From and after January first, 1916, no intoxicating liquors shall be manufactured, or sold within this state, except for medicinal purposes upon prescription of a licensed physician, or for scientific, sacramental or mechanical purposes." Laws 1915, p. 12; Or. L., p. 94.

The other amendment reads thus:

"Article I of the Constitution of the State of Oregon shall be, and hereby is amended by the addition of a Section to said Article I, and it shall be designated as Section 36 of Article I.

"Section 36. The death penalty shall not be inflicted upon any person under the laws of Oregon. The maximum punishment which may be inflicted shall be life imprisonment.

"All provisions of the Constitution and laws of Oregon in conflict with this section are hereby abrogated and repealed in so far as they conflict herewith, and this section is self executing."

The official pamphlet for the November 3, 1914, election was mailed to every registered voter; and the pamphlet contained the proposed prohibition amendment in full and advised the voters that the object was to amend Article I of the Constitution "by adding thereto a section to be designated Section 36 of Article I," and that the purpose of the amendment was to prohibit the manufacture and sale of intoxicating liquors within the State of Oregon after January 1, 1916, except for medicinal, scientific, sacramental or mechanical purposes. The official ballots, among other things, referred to the measure as the "Prohibition Constitutional Amendment" and appropriately expressed the purpose of the proposed amendment.

The official pamphlet also contained a full copy of the proposed amendment abolishing the death penalty and likewise advised the voters that this proposed amendment was designed to "amend Article I by adding thereto a section to be designated Section 36" and that "its purpose is to abolish the death penalty for murder committed in the State of Oregon and fix life imprisonment as the maximum punishment for any crime. It repeals all provisions of the Constitution and laws in conflict with the same."

The official ballots referred to the measure as a constitutional amendment "Abolishing the Death Penalty" and appropriately expressed the purpose of the amendment. The amendment abolishing the death penalty appeared on the official ballots immediately after the prohibition amendment. The initiative petition for the prohibition amendment was sponsored by a group of persons whose names were given in the official pamphlets as well as on the official ballots; and the petition for the amendment abolishing the death penalty was sponsored by one

person whose name appeared on the official ballots. There was no possibility of the voters confusing one proposed amendment with the other. Even though neither amendment had been numbered, nevertheless each would have been completely distinguished from the other; and even though each was numbered 36, each was nevertheless completely identified and was unmistakably distinguished from the other.

The legislature which convened next after the November, 1914, election, repealed "Sections 1598, 1599, and 1600, L. O. L., relating to the enforcement of the death penalty." Chapter 92, Laws of 1915. At the November 7, 1916, election an amendment to the Constitution was proposed by an initiative petition and adopted by the voters. It is known as the prohibition amendment forbidding importation of intoxicating liquors for beverages.

The amendment declares that—

"Section 36, article I of the constitution of the State of Oregon, relating to the manufacture and sale of intoxicating liquors shall be, and hereby is amended by adding thereto the following paragraph .which shall be known as section 36–a"; and then follows the body of the amendment.

The legislature in 1919 authorized a codification of the laws of Oregon; and Hon. CONRAD P. OLSON, who was selected as Code Commissioner, compiled the laws; and the Governor by proclamation dated October 5, 1920, declared the compilation to be in full force and effect. In this compilation the prohibition amendment of November 3, 1914, is numbered 36, the prohibition amendment of November 7, 1916, is designated as Section 36–a, and the amendment of November 3, 1914, abolishing the death penalty is numbered Section 37.

At the special session of the legislature held in 1920 a resolution known as S. J. R. No. 2 was introduced in the senate and referred to the committee on judiciary: Journals, p. 39. This resolution begins by declaring "that section 36 of article I of the constitution of the state of Oregon, which reads as follows, to-wit": here appears a complete copy of the constitutional amendment of 1914 abolishing the death penalty, followed by these words, "be and the same hereby is amended so as to read as follows": and then appears the body of the amendment proposed by the resolution. The committee on judiciary reported to the senate and the report recommended that S. J. R. No. 2 be laid upon the table "and that the Senate Joint Resolution herewith submitted (S. J. R. No. 8) be substituted in its place and which said last resolution we recommend be adopted." Journals, p. 44. The report of the committee was adopted, and S. J. R. No. 8 was substituted for S. J. R. No. 2. Both houses adopted S. J. R. No. 8, the presiding officers signed it, and it was enrolled and filed with the Secretary of State. Omitting the paragraph which authorizes the Secretary of State to set aside four pages in the official pamphlet for arguments for and against the measure and the paragraph authorizing the appointment of a committee to prepare an affirmative argument and a committee to prepare a negative argument, S. J. R. No. 8 reads as follows:

"Be it resolved by the senate, the house of representatives concurring, that the following amendment to the constitution of the state of Oregon be, and the same is hereby proposed:

"Article I of the constitution of the state of Oregon shall be and is hereby amended as follows:

" 'Section 36 of said Article I, which was proposed by the people by initiative petition and approved by

a majority of votes cast thereon at the general election held November 3, 1914, and by a proclamation of the governor, dated December 3, 1914, took effect on said date and which section reads as follows: "The death penalty shall not be inflicted upon any person under the laws of Oregon. The maximum punishment which may be inflicted shall be life imprisonment. All provisions of the constitution and laws of Oregon in conflict with this section are hereby abrogated and repealed in so far as they conflict herewith, and this section is self-executing," be and the same is hereby repealed; provided, however, that the repeal of said section hereby made shall not affect the indictment, prosecution, trial, verdict, judgment or punishment of any crime of murder committed before such repeal, but all laws relating thereto are hereby continued in full force and effect for such purpose.'

"That there be and is hereby added to said article I of the constitution of the state of Oregon the following section, which shall be numbered 37:

" 'Section 37. The penalty for murder in the first degree shall be death, except when the trial jury shall in its verdict recommend life imprisonment, in which case the penalty shall be life imprisonment.'

"That there be and is hereby added to said article I of the constitution of the state of Oregon, the following section, which shall be numbered 38:

" 'Section 38. All provisions of the laws of Oregon abrogated and repealed as in conflict with section 36, which section is herein repealed, are hereby revived as of full force and effect from and after the adoption of this constitutional amendment, subject to amendment by the legislative assembly.' "

S. J. R. No. 8 was printed in full in the official pamphlet prepared for the May 21, 1920, election and sent to all registered voters. The pamphlet contained two pages of affirmative argument and one page of negative argument. The pamphlet further advised the voters that the proposed amend-

ment would be submitted to them at the election to be held on May 21, 1920, for their approval or rejection and that the amendment was only to

"repeal section 36 of article I, providing the death penalty shall not be inflicted, and adding to article I two sections which shall be numbered and designated as sections 37 and 38 of said article I providing the penalty for murder in the first degree shall be death, except when the trial jury in its verdict shall recommend life imprisonment and reviving all provisions of the laws of Oregon abrogated and repealed as in conflict with said section 36 of article I herein repealed, proposed by the special session of the thirtieth legislative assembly under senate joint resolution No. 8, * * "

The official pamphlet also informed the voters:

"This is the way the proposed constitutional amendments and measures will appear on the official ballot"; and on the same page the following appeared:

"Submitted by the legislature—Restoring Capital Punishment—Purpose: To restore capital punishment by providing by constitutional amendment that the penalty for murder in the first degree shall be death, except when the trial jury shall, by their verdict, recommend life imprisonment.

"304 Yes.
"305 No.                    Vote Yes or No."

5. The amendment proposed by S. J. R. No. 8 was approved by a majority of the voters at the election held on May 21, 1920; and on June 18, 1920, the Governor issued his proclamation declaring the result of the election; and consequently on that date the amendment became effective: *Phy* v. *Wright,* 75 Or. 428 (146 Pac. 138, 147 Pac. 381).

The same legislature that adopted S. J. R. No. 8 and submitted it to the voters also enacted two stat-

utes designated respectively as Chapter 19 and Chapter 20. The former, Chapter 19, provides as follows:

"Section 1. Every person convicted of murder in the first degree shall be punished with death, except when the trial jury shall, in its verdict, recommend life imprisonment, in which case the penalty shall be life imprisonment; provided, however, that this act shall take effect as soon as and whenever the constitutional provisions of section 36 of article I of the constitution of the state of Oregon relating to the death penalty, and any amendment or amendments thereto, will permit." Chapter 19, L. 1920.

Chapter 20, Laws of 1920, contains four sections. The first three sections prescribe the mode of executing the death sentence. The fourth section is as follows:

"This act shall take effect as soon as and whenever the constitutional provisions of section 36 of article I of the constitution of the state of Oregon relating to the death penalty, and any amendment or amendments thereto, will permit."

Section 1598, L. O. L., contains a proviso governing crimes committed prior to May 17, 1903. With the exception of this proviso Section 1 of Chapter 20, Laws of 1920, is an exact copy of Section 1598, L. O. L., save only that the words "be not less" in Section 1598, L. O. L., reads "not be less" in Section 1 of Chapter 20.

Section 1599, L. O. L., likewise contains a proviso designed to cover cases in which the punishment of death is inflicted for crimes committed prior to May 17, 1903; but, excepting the proviso, Section 2 of Chapter 20 is identical with Section 1599, L. O. L.

Section 1600 also contains a proviso relating to cases where the crime was committed prior to May

17, 1903; and, with the exception of this proviso, Section 3 of Chapter 20 is identically the same as Section 1600, save only that, where Section 1600 refers to the first of the three sections as Section 1598, in Section 3 of Chapter 20 the first section is referred to as Section 1.

6, 7. In the Evans case it was argued that the amendment embraced in H. J. R. No. 8 is

"so indefinite, uncertain and repugnant in its provisions that it is void and of no force and effect and that the death penalty for crime in Oregon has been repealed and never has been revived."

This argument is based upon the notion that a hopeless inconsistency and unsolvable indefiniteness arise out of the circumstance that the amendment abolishing the death penalty was carried into Olson's Compilation as Section 37, and the fact that the death penalty amendment of 1920 refers to Section 36, and the further fact that there were two sections numbered 36 which were adopted in 1914. A complete demonstration of the fallacy of the argument advanced in the Evans case is furnished by a mere reading of the foregoing recital. One group of persons caused an initiative petition to be circulated for the submission of the constitutional amendment prohibiting the manufacture or sale of intoxicating liquors, while another person was sponsoring the circulation of a different petition for the submission of an amendment abolishing capital punishment. Each petition was for a totally different purpose, and neither is in any way related to the other. Article I of the Constitution embraced only thirty-five sections and naturally each of the two petitions designated the amendment proposed by it as Section

36.   When S. J. R. No. 2 was prepared the constitutional amendment of 1914 which it was proposed to repeal was not only correctly referred to as Section 36 but it was accurately and completely identified by being set out in full; and so, too, S. J. R. No. 8, which was received and adopted as a substitute for S. J. R. No. 2, likewise correctly referred to the constitutional provision proposed to be repealed as Section 36 and accurately and completely identified that section by setting it out in full.   It was of course known that if Section 36 so identified should be repealed, the Constitution would still contain the prohibition section numbered 36 and the prohibition section numbered 36a; and so the two sections of the proposed amendment were properly numbered 37 and 38.   The amendment of 1920 was absolutely accurate when it referred to the constitutional provision abolishing the death penalty as Section 36, because that was the number given to it when it was submitted in 1914.   However, the validity of the amendment of 1920 would not be affected at all even though it had referred to the amendment of 1914 by giving the wrong section number; for the reason that the section of the Constitution intended to be repealed was set out in full and only one such section appeared in the Constitution: *State v. Robinson*, 32 Or. 43 (48 Pac. 357).   The amendment of 1914 relating to the death penalty nowhere appears as Section 37 except in Olson's Compilation. But it must be remembered that the amendment of 1914 was repealed by the amendment of 1920, and that since the amendment of 1920 became effective on June 18, 1920, from that date the amendment of 1914 ceased to exist as a part of the Constitution

and had no proper place in the Olson compilation which did not become effective until October 5, 1920. We have no doubts whatever about the validity of the amendment of 1920. It was properly submitted to the voters; it was legally adopted by the electorate; and it is a part of our organic law.

8. We now give attention to the claim that there is no statute prescribing the mode of executing the death penalty. We agree with counsel when they say: "If any prior decisions were erroneous and wrong upon principle and authority the court should not hesitate to now declare the law correctly"; and it is not inappropriate to state further that the arguments advanced by counsel have been examined with a full realization of the responsibility resting upon court and counsel. In *State* v. *Rathie,* 101 Or. 339, 364 (199 Pac. 169, 200 Pac. 790), it was contended that Chapter 20, Laws of 1920, was unconstitutional because its taking effect is made dependent upon the adoption by the people of the constitutional amendment proposed by S. J. R. No. 8; but it was there held on the authority of *Libby* v. *Olcott,* 66 Or. 124 (134 Pac. 13), that the contention could not be sustained. In order that the argument made in behalf of the defendants may be stated in a light most favorable to them, we shall assume for the purposes of the discussion that counsel are correct when they say that the Rathie case goes no further than to decide the point already mentioned and that counsel are now presenting a point which is new and has not yet been decided by this court.

This new point attempted to be made involves the following contentions: (1) That the constitutional amendment of 1914 did not repeal Sections

1598, 1599 and 1600, L. O. L.; (2) that Chapter 92, Laws of 1915, did repeal Sections 1598, 1599 and 1600, L. O. L.; (3) that Chapter 20, Laws of 1920, did not contain an emergency clause and consequently, if it could become a law at all it became a law on April 17, 1920, although its operation was postponed until such time as S. J. R. No. 8 became a part of the Constitution; (4) that on April 17, 1920, the constitutional amendment of 1914 was in full force and effect and therefore Chapter 20 was in conflict with the then Constitution and for that reason the statute was unconstitutional; (5) that Section 38 of the constitutional amendment of 1920 revived only such laws as were repealed by the amendment of 1914, and, since the amendment of 1914 did not repeal Sections 1598, 1599 and 1600, L. O. L., and since those three sections of the Code were expressly repealed by Chapter 92, Laws of 1915, it follows that Sections 1598, 1599 and 1600, L. O. L., do not now exist and have not existed at any time since 1915: (6) and finally that, since Sections 1598, 1599 and 1600, L. O. L., have not existed since 1915 and since Chapter 20, Laws of 1920, was unconstitutional and never did become a valid law, no statute exists prescribing the mode of executing the death sentence.

The briefs devote much space to the constitutionality of Chapter 19, Laws of 1920, which enacts that every person convicted of murder in the first degree shall be punished by death except when the trial jury shall in its verdict recommend life imprisonment, in which case the penalty shall be life imprisonment,

''provided, however, that this act shall take effect as soon as and whenever the constitutional provisions of section 36 of article I of the constitution of the

state of Oregon relating to the death penalty, and any amendment or amendments thereto, will permit."

9. This statute may be entirely ignored, for the simple reason that it is nothing more than a repetition of the mandatory language of the organic law. The constitutional amendment of 1920 by its own solemn and mandatory terms makes death the penalty for murder in the first degree except where the jury recommends life imprisonment; and therefore it was not necessary for the legislature to enact Chapter 19. If Chapter 19 had never been enacted nevertheless the death penalty must, because of the irresistible and compelling power of the Constitution, be enforced in every case of murder in the first degree, unless the jury recommends life imprisonment, and unless it can be said that the mandate of the Constitution cannot be obeyed on account of the want of a lawful procedure for executing the sentence of death.

Is Chapter 20, Laws of 1920, unconstitutional? Section 28 of Article IV of the Constitution provides that:

"No act shall take effect until ninety days from the end of the session at which the same shall have been passed, except in case of an emergency; which emergency shall be declared in the preamble or in the body of the law."

10, 11. Chapter 20, Laws of 1920, does not contain an emergency clause, and hence it cannot take effect until ninety days from the end of the session. The language of Article IV, Section 28 of the Constitution possibly affords ground for debate as to whether or not the legislature can extend the ninety days period. It is certain that the period cannot be shortened to less than ninety days except in case

of an emergency which shall be declared in the pre-
amble or in the body of the law.   It is also certain
that if the legislature is silent as to when a measure
shall take effect, the measure in that event takes
effect ninety days from the end of the session, be-
cause such result is necessarily involved in the lan-
guage of Section 28.   But suppose that the legisla-
ture expressly fixes a later date, can it be said that
the legislature has exceeded its power?   If the legis-
lature cannot postpone the date beyond ninety days
it is only because Section 28 contains an implied
prohibition; for the section does not in express terms
prohibit the fixing of a longer period.   But does it
contain such an implied prohibition?   It must be re-
membered that the state Constitution is an instru-
ment of limitation; it is not an instrument of grant
as is the national Constitution.   The legislature can
enact any legislation not prohibited by the Constitu-
tion.   However, instead of attempting to decide this
question, we shall assume, for the purpose of giving
to the defendants the benefit of every doubt, that the
legislature is powerless to lengthen the ninety days
period.

The legislature adjourned on January 17, 1920;
and we shall assume that counsel are correct when
they argue that Chapter 20, Laws of 1920, became a
law, if at all, on April 17, 1920.   A measure may be-
come a law on a determined date, and yet that law
may not go into active operation until some later date
or until the happening of some contingency.   When
a measure having no emergency clause passes through
the hands of the legislature and when it becomes
a complete and perfect law upon the expiration
of the ninety days period nothing more is required

to make it a law; and yet something may be required to bring it into operation. The measure takes effect as a law in the sense that it is a complete act of law making when the ninety days expire, but its active operation may be made dependent upon some contingency. The distinction we are attempting to express is illuminatingly discussed in *Fouts* v. *Hood River,* 46 Or. 492 (81 Pac. 370, 7 Ann. Cas. 1160, 1 L. R. A. (N. S.) 483), where one of the parties unsuccessfully contended that the local option law was unconstitutional because its operation was made dependent upon the popular vote of the locality or localities within which it might be sought to have the law applied. It is true that Section 4 of Chapter 20, Laws of 1920, uses these words: ''shall take effect''; but for the purpose of this case we shall assume that the language of Section 4, Chapter 20, is not used in the sense in which like language is employed in Article IV, Section 28 of the Constitution, and we shall also assume that Section 4 of Chapter 20 merely means that the active operation of Chapter 20 is postponed until the adoption of the 1920 amendment to the Constitution. We therefore assume that counsel for the defendants are correct when they contend that Chapter 20 became a law on April 17, 1920. On that date the constitutional amendment of 1914 was in force; and, therefore, the defendants argue that Chapter 20 was in conflict with the then Constitution and for that reason is unconstitutional. If Chapter 20 was unconstitutional on April 17, 1920, it is not now unconstitutional; because the constitutional amendment of 1920 does not attempt to validate Chapter 20, and in this respect the instant case is to be distinguished from *Boyd* v. *Olcott,* 102 Or. 327 (202 Pac. 431). See, also, 12 C. J. 1092.

Was Chapter 20 in conflict with the constitutional amendment of 1914 which was in force on April 17, 1920? It is true that the Constitution at that time declared that "the death penalty shall not be inflicted upon any person under the laws of Oregon"; but it is also true that, even though Chapter 20 became a law on April 17, 1920, it could not by force of its own terms operate until the then Constitution should be amended. If the question of conflict is to be determined by the possibility of the statute running counter to the Constitution, then there was no conflict between Chapter 20 and the Constitution; because the operation of Chapter 20 was by its own restraining language absolutely prevented from operating and hence from running counter to the then Constitution. Since the language is apt, we quote from *Pratt* v. *Allen,* 13 Conn. 119, 126:

"The act is not intended to, nor does it oppose any existing article in the constitution; but it is intended to meet and accord with its proposed substitute."

12–15. Chapter 20 was enacted for the sole purpose of prescribing a procedure which should be and could be available only upon the amendment of the Constitution. The purpose was to make Chapter 20 operative contemporaneously with but not before the amendment of the Constitution. It is our view that Chapter 20 is constitutional; and this view, although opposed by the holding in *Etchison Drilling Co.* v. *Flournoy,* 131 La. 442 (59 South. 867), is supported by *Pratt* v. *Allen,* 13 Conn. 119, *Galveston B. & C. etc. Co.* v. *Gross,* 47 Tex. 428, 436, and *State ex rel.* v. *Kirkley,* 29 Md. 85, 104. See, also, 8 Cyc. 770; 12 C. J. 742.

Notwithstanding the fact that it is our view that Chapter 20, Laws of 1920, is constitutional, we shall

nevertheless assume, in order again to give to the defendants the benefit of any possible doubt, that Chapter 20, in despite of Section 4, is unconstitutional, on the theory that on April 17, 1920, it was in conflict with the then Constitution. This assumed conflict arose from the fact that the first three sections of Chapter 20 prescribed the method of executing the death penalty, and from the further fact that the constitutional amendment of 1914 prohibited the infliction of the death penalty. It will be remembered that the constitutional amendment of 1914 provided that all laws of Oregon in conflict with the amendment "are hereby abrogated and repealed in so far as they conflict herewith." The defendants argue that the amendment of 1914 merely suspended and did not repeal Sections 1598, 1599 and 1600, L. O. L. But this position taken by the defendants is manifestly inconsistent with their contention that Chapter 20 conflicted with the amendment of 1914. If Sections 1598, 1599 and 1600, L. O. L., were in conflict with the amendment of 1914 then they were indubitably repealed. Now, if Chapter 20, Laws of 1920, prescribing the mode for executing the death sentence was in conflict with the amendment of 1914, which abolished the death penalty, then inevitably Sections 1598, 1599 and 1600, L. O. L., likewise prescribing the mode of procedure for executing the death penalty, were in conflict with the amendment of 1914 abolishing the death penalty; and the three sections of the then Code being in conflict with the amendment of 1914 were by the express terms of the latter repealed. The same argument which makes Chapter 20 unconstitutional inevitably leads to a repeal of Sections 1598, 1599 and 1600, L. O. L., by the constitutional amendment of 1914. It must also

be remembered that the constitutional amendment of 1920 expressly declared that "all provisions of the laws of Oregon abrogated and repealed as in conflict with the" amendment of 1914 "are hereby revived as of full force and effect from and after the adoption of this constitutional amendment," and therefore, Sections 1598, 1599 and 1600, L. O. L., were revived and again became effective upon the adoption of the amendment of 1920. It is true that the legislature passed Chapter 92, Laws of 1915, repealing Sections 1598, 1599 and 1600, L. O. L., but it is also true that these three sections of the Code had already been repealed, and hence the act of 1915 was mere "wasteful excess." It is obvious that one of the objects to be accomplished by the amendment of 1920 was the revival of whatever laws had been repealed by the amendment of 1914; and it is likewise obvious that the legislative act of 1915 could not thwart the accomplishment of that object. It is competent by a constitutional provision to revive a repealed statute: 8 Cyc. 768; 12 C. J. 721; *State ex rel.* v. *Luther,* 56 Minn. 156 (57 N. W. 464); *Hammond* v. *Clark,* 136 Ga. 313 (71 S. E. 479, 38 L. R. A. (N. S.) 77). It must further be remembered that, excepting slight verbal differences and the provisos previously mentioned, the first three sections of Chapter 20, Laws of 1920, are copies of Sections 1598, 1599 and 1600, L. O. L.; and, therefore, since the procedure to be followed under Chapter 20, is identically the same in every particular as the procedure to be followed under Sections 1598, 1599 and 1600, L. O. L., it necessarily results that whether Sections 1598, 1599 and 1600, L. O. L., are the only laws in force, or whether Chapter 20 is the only law in force, or whether Chapter 20 was con-

stitutional on April 17, 1920, and Sections 1598, 1599 and 1600, L. O. L., were revived by the amendment of 1920 and both Chapter 20 and the three sections of Lord's 'Oregon Laws were in force upon the adoption of the amendment of 1920, there is in either of such situations a prescribed procedure provided for carrying out the death penalty and that prescribed procedure is in each of such situations the same. If it be said that Chapter 20 was constitutional on April 17, 1920, and that the constitutional amendment of 1920 revived Sections 1598, 1599 and 1600, L. O. L., and that because of the provisos in the last-mentioned sections these three sections and Chapter 20 cannot stand together at the same time, then it must also be said that because a constitution dominates a statute the constitutional amendment of 1920 gives superior authority to the three sections of Lord's Oregon Laws.

16. The contention that the constitutional amendment of 1914 merely suspended Sections 1598, 1599 and 1600, L. O. L., goes on the theory that the relation of the constitutional amendment to the three sections mentioned is analogous to the relation sustained between the local option law and laws and ordinances providing for licenses for the sale of intoxicating liquors: See *Fouts* v. *Hood River,* 46 Or. 492 (81 Pac. 370, 7 Ann. Cas. 1160, 1 L. R. A. (N. S.) 483). But the situations are materially and inherently different. The whole plan of the local option measure contemplated that when it became a complete law, all state laws and city ordinances permitting the issuance of licenses would not only continue to be state laws and city ordinances but would continue to be operative until the voters of a given locality by their votes made the local option law operative in the locality. The plan of the local op-

tion law necessarily involved the idea that it and the license laws would continue to be laws; that so long as the local option law did not actively operate that long the license laws would operate; and that the moment the local option law was brought into active operation that moment the license laws would be suspended and cease to operate. The local option law, as its name indicates, made it optional with the voters to say whether it should operate or whether the license laws should continue to operate. The local option law contemplated that either it or the license laws could be made operative but that both could not operate at the same time. If one operated then the operation of the other was suspended. But the constitutional amendment of 1914 involved no such plan as the one embraced by the local option law. The amendment of 1914 contemplated that the moment it became a part of the Constitution it would go into operation and continue in operation without interruption. The constitutional amendment was designed to abolish the death penalty. The amendment did not contemplate the possibility of its own suspension and the operation of any law enforcing the death penalty. The language is:

"All * * laws of Oregon in conflict with this section are hereby abrogated and repealed in so far as they conflict herewith."

indicates an intention not only that the constitutional amendment should alone be operative but also that every law should be repealed if its operation conflicted with the amendment. All will no doubt agree that Section 1903, L. O. L., prescribing death as the punishment for murder in the first degree, was repealed by the constitutional amendment; for Section 1903, L. O. L., could not operate without conflicting with the constitutional amendment. And

it would seem to be equally clear that the constitutional amendment likewise repealed Sections 1598, 1599 and 1600, L. O. L., which sections merely afforded the machinery for Section 1903, L. O. L.; for assuredly the machinery could not be put in operation without conflicting with the constitutional amendment. We repeat that the local option law was framed on the theory that it might or might not be made operative, depending upon the option of the voters in the different localities, and on the theory that if it should be made operative the license laws would cease to operate and be suspended. We also repeat that no such theory is involved in the constitutional amendment of 1914. It is our view that Chapter 20, Laws of 1920, was constitutional on April 17, 1920; it is also our view that the constitutional amendment of 1914 repealed Sections 1598, 1599 and 1600, L. O. L., and that these three sections were revived by the constitutional amendment of 1920; and further it is our view that if Chapter 20 was unconstitutional on April 17, 1920, then necessarily the three sections of L. O. L. were repealed in 1914 and revived in 1920. From whatever angle the case is viewed the conclusion is that there is a prescribed and unvarying procedure for executing the death penalty; and hence it follows that the contention of the defendants cannot be sustained.

On July 18, 1922, Hecker filed a motion for a new trial together with four affidavits relating to the alleged separation of the jury; and the state on July 20, 1922, filed a counter-affidavit relating to the same subject. The defendant is now, and apparently for the first time, urging that the counter-affidavit was not filed within the time required by Section 175, Or. L., which, so far as it is material here, reads as follows:

"A motion to set aside a judgment and for a new trial, with the affidavits, if any, in support thereof, shall be filed within one day after the entry of the judgment sought to be set aside, or such further time as the court may allow. When the adverse party is entitled to oppose the motion by counter-affidavits, he shall file the same within one day after the filing of the motion, or such further time as the court may allow. * * *"

The state insists that in computing the time fixed by Section 175, Or. L., the rule followed in *Pringle Falls Power Co.* v. *Patterson,* 65 Or. 474 (128 Pac. 820, 132 Pac. 527), *Vincent* v. *First National Bank,* 76 Or. 579 (143 Pac. 100, 149 Pac. 938), and in *Nealan* v. *Ring,* 98 Or. 490 (184 Pac. 275, 193 Pac. 199), should govern. See, also, *United States Nat. Bank* v. *Shefler,* 77 Or. 579, 581 (143 Pac. 51, 152 Pac. 234); *Watson* v. *Salem,* 84 Or. 666 (164 Pac. 567, 164 Pac. 1184); *In re Andersen's Estate,* 101 Or. 94, 97 (188 Pac. 164, 198 Pac. 236); *Re Application of Riggs,* 105 Or. 531, 533 (207 Pac. 175, 1005, 210 Pac. 217). While the rule contended for by the state would bring the counter-affidavit within the time, the view which we take of Section 175, Or. L., renders it unnecessary for us to decide whether the precedents relied upon by the state apply only to appeals and are made so to apply solely because of the doctrine of *stare decisis.*

17–19. It must be conceded that the motion for a new trial is required to be filed within the time prescribed by Section 175, Or. L.: *State* v. *McDaniel,* 39 Or. 161, 185 (65 Pac. 520); *White* v. *Geinger,* 70 Or. 81 (139 Pac. 572). The motion itself is analogous to a pleading, and the limitation of time is akin to a statute of limitation; so that the motion, or pleading, must be filed within the prescribed time, or statute

of limitation, in order to confer upon the court juris-
diction to hear and consider the motion. An affidavit
is only a mode of taking evidence; the declarations
contained in an affidavit constitute evidence to be
considered by the court: Sections 825, 826, Or. L.
The motion for a new trial was filed in time, and
therefore the court acquired jurisdiction to consider
the question of a new trial. The defendant's evi-
dence was submitted with the motion and of course
was in time. The bill of exceptions does not show
whether the court did or did not extend the time for
filing counter-affidavits: See *Sanders* v. *Taber,* 79 Or.
522, 524 (155 Pac. 1194). However, we understand
from the state's printed brief that an extension of
time was not requested; consequently we shall as-
sume that the court did not on or before July 19th
grant an extension of time. When the defendant
filed his motion with the four affidavits he filed his
pleading and submitted his evidence, and nothing
then remained for the state to do except to submit
its evidence. On July 20th the state submitted its
evidence. The record does not tell us that the de-
fendant objected to the reception of the state's evi-
dence, nor are we informed by the briefs or other-
wise that any objection was made to the consideration
of the state's evidence until after the defendant ap-
pealed. The trial court did consider the counter-
affidavit; and the fact that the counter-affidavit was so
considered was equivalent to granting permission to
file the affidavit, although such permission may for
the purpose of this case be treated as having been
given after the time prescribed by Section 175, Or. L.
Let it be supposed that a motion for a new trial with
one supporting affidavit is filed in time, and on the
same day one counter-affidavit is filed, and that four

days afterwards and before the motion is heard one party for the first time discovers six persons who make as many affidavits, which if received will show beyond any doubt that the single opposing affidavit is false, would it not be a travesty on the law to say that the court could not in its discretion permit the filing of those six affidavits and be advised by the evidence in them and thus be enabled to know the truth? It is true that the word "shall" is used in Section 175, Or. L., in connection with counter-affidavits, but it is also true that the word is not always used in an absolutely mandatory sense. The following excerpt from Vol. 2, Bouvier's Law Dictionary, Rawle's Revision, page 1032, is peculiarly appropriate:

"As to mandatory and directory statutes, it is said that when the provision of a statute is the essence of the thing required to be done, it is mandatory; otherwise, when it relates to form and manner; and where an act is incident, or after jurisdiction acquired, it is directory merely."

No good reason exists to prevent the court from hearing evidence after the one day prescribed by the statute in cases where jurisdiction is acquired to hear and to consider, if in the opinion of the court justice will be promoted. Any other rule would not infrequently bring about the doing of a wrong and thwart justice by preventing the ascertainment of the truth.

20. The jury was composed of seven men and five women. There is one toilet connected with the jury-room, but in the language of the affidavit of the bailiff it is "in such position that it cannot be used by a mixed jury when both men and women are in the jury-room." The toilet for women is about twenty feet distant from the door of the jury-room.

After the jurors had entered the jury-room the women on the jury signified a desire to retire to the toilet for women, and thereupon the bailiff, after locking the men jurors in the jury-room, conducted the women to the door of the women's toilet, and the women jurors entered the latter room, no other person being therein. After a few minutes the women jurors came out and were conducted back to the jury-room. When going to the door of the women's toilet and back to the jury-room the women jurors were in charge of the bailiff and during that time none of them spoke to any other person, nor did any other person speak to any of them, "nor was there any discussion or comment made by any person in their presence." The defendant contends that the toilet connected with the jury-room made it unnecessary for the women to go elsewhere but the trial judge concluded otherwise; and we agree with him that the requirements of decency and the accepted canons of modesty and propriety enter into the calculation when determining whether it was necessary for the women jurors to use a toilet other than the one immediately connected with the jury-room. The provisions of Section 141, Or. L., were not violated: 16 C. J. 1077.

The defendant complains because the court gave the following instruction:

"To illustrate: If an entire stranger, being sane and in possession of his faculties, should walk, without provocation, out of the audience here, and take an axe and unlawfully and purposely strike one of you jurymen down dead, the law would conclusively presume malice from that act, although there might not be any proof that he had any quarrel with the person so assaulted."

21. It is contended that this instruction was prejudicial error because it omits the important element of deliberation; but as stated in *State* v. *Hansen,* 25 Or. 392, 404 (35 Pac. 976, 36 Pac. 296), the instructions must be taken as a whole. The court gave elaborate instructions upon the element of deliberation, and we are certain that the jury could not have been misled on account of the omission of any reference to the element of deliberation.

22. It is next claimed that the instruction was inflammatory, revolting and grewsome, and that it was especially prejudicial because some of the members of the jury were women. The instruction was evidently taken from the charges given by the present Chief Justice in *State* v. *Lauth,* 46 Or. 342 (80 Pac. 660, 114 Am. St. Rep. 873), and in *State* v. *Jancigaj,* 54 Or. 361 (103 Pac. 54), for an examination of the records in the hands of our clerk discloses that the quoted instruction is identical with an instruction given in each of those two cases. In order that the influence and bearing of the questioned instruction may be fully understood, a portion of the charge immediately preceding it and a portion immediately following it are here set down together with a repetition of the challenged instruction.

"It must also be done maliciously, but by malice is not necessarily meant envy, hatred, grudge or ill will. It means, so far as it is necessary to define it in this case, an intent to unlawfully, and without provocation, injure another. And the law presumes a malicious and guilty intent from the deliberate commission of an unlawful act for the purpose of injuring another. It also presumes an intent murder from the deliberate use of a deadly weapon, causing death within one year. It also presumes that a man intends the ordinary and natural consequences of his own acts. It is not necessary, in order to constitute

malice, that there should be any grudge between these parties, or any old feud between them. It is sufficient in that respect if the state shall prove that the defendant intended to do the act that he is charged with in this indictment, and did it in pursuance of such intent.

"If the state proves that the defendant intended unlawfully to kill deceased, without provocation, and that he did so kill him in pursuance of such intent, such killing is of malice.

"To illustrate: If an entire stranger, being sane and in possession of his faculties, should walk, without provocation, out of the audience here, and take an axe and unlawfully and purposely strike one of you jurymen down dead, the law would conclusively presume malice from that act, although there might not be any proof that he had any quarrel with the person so assaulted.

"So you will see that malice is the intent, without provocation or excuse, unlawfully to injure or harm another person. There must not only be purpose and malice, but there must be deliberation and premeditation. By premeditation and deliberation is meant that the act must be thought out, intended and deliberated upon before its commission, and not be the offspring of a sudden emergency."

The illustration was apt and aided the court in explaining the meaning of malice; and while the same apt illustration could have been given by referring to some person other than a juror, nevertheless in the circumstances presented here it cannot be said that the illustration as given was prejudicial.

23. The defendant complains of the following instruction:

"You should give the defendant the benefit of all reasonable doubts, and there is no technical way of judging it other than using your ordinary plain common sense in judging."

The challenged instruction together with substantially all of the instructions treating of reasonable doubt were taken from the closely contested and carefully considered case of *State* v. *Hansen,* which was affirmed by this court and is reported in 25 Or. 391, 402 (35 Pac. 976, 36 Pac. 296).

24. The defendant requested but the court refused to give the following instruction:

"In case you return a verdict of murder in the first degree you may in your discretion make a recommendation of punishment by life imprisonment and this recommendation must be incorporated in your verdict; otherwise a verdict of murder in the first degree without this recommendation would be followed by hanging. In other words, if you should return a verdict of murder in the first degree, the law gives you the right to recommend the punishment therefor at life imprisonment but unless such recommendation is incorporated in your verdict the penalty fixed by law is death by hanging."

However, the court did instruct the jury thus:

"In this case you may find one of five verdicts: Guilty of murder in the first degree, as charged in the indictment; guilty of murder in the first degree, and we recommend life imprisonment; murder in the second degree; manslaughter, or you may find a general verdict of not guilty."

The court also charged the jury as follows:

"If therefore, you find from the testimony in this case that the defendant in cool blood purposely and of deliberate and premeditated malice killed the deceased in this county and state at any time before the finding of this indictment, your verdict should be guilty of murder in the first degree, or guilty as charged in the indictment.

"If, however, you should find the defendant guilty of murder in the first degree, and in your judgment the death penalty should not be invoked, then your

verdict would be guilty as charged in the indictment and we hereby recommend life imprisonment.''

Before concluding the charge the court advised the jury as follows:

"As I have said before, you have simply been called here as a part of the machinery of justice to do one thing, find one fact, and that fact you must find from the evidence produced from this stand, forgetting all your sympathies and all your prejudices; lay them aside; forget that these men were ever engaged in so-called bootlegging, and try it right on the facts in this case. Is he guilty of murder in the first degree? If he is, should he be recommended to leniency? That is, should he be confined in the penitentiary? Or murder in the second degree, manslaughter, or is he not guilty?''

The instructions given by the court were sufficient.

25. The court instructed the jury fully and correctly upon the subject of self-defense, and the court did not err in refusing to give the following instruction:

"In this case the defendant urges in his defense under his plea of not guilty, that he acted in self-defense, and if the evidence in behalf of the defendant relating to self-defense is sufficient to raise a reasonable doubt in your minds as to his guilt, it is your duty to find him not guilty, although such evidence may not have demonstrated such self-defense to a mathematical certainty.''

26. As already stated complete and accurate instructions were given upon the subject of self-defense. Indeed, the defendant makes no complaint about the instructions which were given concerning self-defense. Ample cautionary instructions were also given; and it was not error to refuse to give the following instruction:

"If you find from the evidence that the defendant at the time of the affray was armed with a pistol or gun, that fact must not prejudice you in any way against the defendant in the trial of this case, and you have no right to consider that fact against him, except in so far as that incident was connected, if it was, with the homicide, if any, and the mere fact that the defendant may have been armed with a pistol or gun, whether rightfully or wrongfully, does not take away or lessen his right of self-defense."

27. In one of the briefs reference is made to the sufficiency of the exception as to one of the assignments of error. The subject was also discussed at the hearing. The record contains a bill of exceptions in the short form to which is attached a complete transcript of the testimony and instructions given at the trial: See *Malloy* v. *Marshall-Wells Hardware Co.*, 90 Or. 303 (173 Pac. 267, 175 Pac. 659, 176 Pac. 589). The bill of exceptions shows that the defendant in each instance sufficiently expressed his nonacquiescence in the ruling of the court: *State* v. *Laundy*, 103 Or. 443, 505 (204 Pac. 958, 206 Pac. 290). The record presented by this appeal, as do many records brought to this court, shows that, in nearly every instance, the appellant not only saved an exception but also that "said exception was allowed by the court." One of the purposes of an exception is to inform the court by appropriate language that the party does not acquiesce in the ruling of the court. It is entirely unnecessary for the record to show that the court allowed the exception. The making and preserving of an exception does not depend upon its allowance by the court. Indeed, the court cannot prevent the saving of an exception by saying that an exception is not allowed. If the court rules upon an objection and the party advises the court he does

109 Or.—36

not acquiesce in such ruling, then the record is complete and nothing more is necessary.

A careful and critical examination of the entire record brings us to the conclusion that the trial was free from prejudicial error; and therefore the judgment must be and it is affirmed.

AFFIRMED.    REHEARING DENIED.